UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MAGGIE J. PIERCE,

                              Plaintiff,

v.                                                    **DECISION AND ORDER**
                                                      **17-CV-912**

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

                              Defendant.

_____

## INTRODUCTION

Plaintiff Maggie Pierce brings this action pursuant to the Social Security Act

("the Act") seeking review of the final decision of Acting Commissioner of Social Security

(the "Commissioner"), that granted her applications for disability insurance benefits

("DIB") and for widow's insurance ("DWB") under Title II of the Act, but only as of May 20,

2014.  Dkt. No. 1.  The Court has jurisdiction over this action under 42 U.S.C. § 405 (g).


Both parties have moved for judgment on the pleadings pursuant to Federal

Rule of Civil Procedure 12 (c).  Dkt. Nos. 18, 21.  For the reasons that follow, the

Commissioner's decision is reversed, Plaintiff's motion is granted to the extent that the

matter is remanded solely for calculation and payment of benefits.  Accordingly, the

Commissioner's motion is denied.

## BACKGROUND

On June 18, 2013, the plaintiff, then forty-eight years old, protectively filed an application for DIB with the Social Security Administration ("SSA") alleging disability since September 15, 2012, due to cervical, thoracic and lumbar herniations; lumbar stenosis; C6 radiculopathy; numbness in her legs and hands; headaches; and obesity. Tr.[1] 191-97. On September 23, 2013, the plaintiff's DIB claim was denied by the SSA at the initial level. Tr. 81-88. On September 27, 2013, the plaintiff filed a request for a hearing along with an updated disability report. Tr. 104-5, 244-263. On April 10, 2015, following the death of her husband, she also filed an application for widow's insurance benefits. Tr. 13-14. On July 9, 2015, the plaintiff, her attorney, and a vocational expert ("VE") appeared and testified before Administrative Law Judge, Sharon Seeley ("the ALJ"). Tr. 43-80. On February 3, 2016, the ALJ issued a partially-favorable decision finding the plaintiff was disabled within the meaning of the Act beginning on May 20, 2014, but that she was not disabled on her alleged onset date, September 15, 2012. Tr. 18-42. Plaintiff timely requested review of the ALJ's decision by the Appeals Council which was denied on July 11, 2017. Tr. 4-6. Thereafter, the plaintiff commenced this action seeking review of the Commissioner's final decision that she was not disabled from September 15, 2012 through May 19, 2014. Dkt. No. 1.

---

[1] References to "Tr." are to the administrative record in this matter.

# LEGAL STANDARD

## I.     District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quotation marks omitted); *see also* 42 U.S.C. § 405(g).  The Act holds that a decision by the Commissioner is "conclusive" if it is supported by substantial evidence.  42 U.S.C. § 405(g).  "Substantial evidence means more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quotation marks omitted).  It is not the Court's function to "determine *de novo* whether [the claimant] is disabled."  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quotation marks omitted); *see also Wagner v. Sec'y of Health and Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990) (holding that review of the Secretary's decision is not *de novo* and that the Secretary's findings are conclusive if supported by substantial evidence).

## II.     Disability Determination

An ALJ must follow a five-step process to determine whether an individual is disabled under the Act.  *See Bowen v. Yuckert*, 482 U.S. 137, 140-142 (1987). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity.  *See* 20 C.F.R. § 404.1520(b).  If so, the claimant is not disabled.  If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities.

20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). 20 C.F.R. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement (20 C.F.R. § 404.1509), the claimant is disabled. If not, the ALJ determines the claimant's residual functional capacity ("RFC"), which is the ability to perform physical or mental work activities on a sustained basis, notwithstanding limitations for collective impairments. *See* 20 C.F.R. § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to demonstrate that the claimant "retains a residual functional capacity to perform the alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

**DISCUSSION**

**I.     The ALJ's Decision**

The ALJ's decision analyzed the plaintiff's claim for benefits under the

process described above.  At step one, the ALJ found that the plaintiff had not engaged

in substantial gainful activity since September 15, 2012, the alleged onset date.  Tr. 26.

At step two, the ALJ found that the plaintiff has the following severe impairments: disc

herniations of the cervical, thoracic, and lumbar spine with myelopathy; osteoarthritis of

the left knee; and obesity.  *Id.*  At step three, the ALJ found that these impairments, alone

or in combination, did not meet or medically equal any Listings impairment.  *Id.*


Next, the ALJ determined two separate RFC's for the plaintiff during the

relevant time period.  First, the ALJ found that prior to May 20, 2014, Plaintiff retained the

RFC to "lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently; sit six

hours in an eight-hour workday; stand and/or walk six hours in an eight-hour workday;

occasionally balance, stoop, kneel, crouch, crawl or climb ramps or stairs, but never

climb ladders, ropes, or scaffolds; frequently reach with the bilateral upper extremities;

and perform work that did not involve operating a motor vehicle."  Tr. 27.  Then, the ALJ

determined that beginning on May 20, 2014, the plaintiff retained the RFC to perform

sedentary work[2] with additional limitations.  Tr. 33.  Specifically, the plaintiff can sit six

hours in an eight-hour workday, alternating after one hour to standing 10 minutes; and

---

[2] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a).

stand and/or walk two hours in an eight-hour workday, alternating after 30 minutes to sitting 10 minutes, and using a cane in her dominant right hand while walking. *Id.* Further, the plaintiff can frequently reach, handle or finger with the bilateral upper extremities; occasionally balance, stoop, kneel, crouch, crawl or climb ramps or stairs, but never climb ladders, ropes, or scaffolds; can perform work that does not involve any repetitive twisting or turning of the lower back or operating a motor vehicle; she can maintain attention and concentration throughout the workday with up to one-hour off-task in addition to customary breaks, due to pain and the side effects of medication. *Id.*

At step four, the ALJ relied on the VE's testimony and found that prior to May 20, 2014, the plaintiff retained the RFC to perform her past relevant work as a Production Manager and Management Trainee, as the work is generally performed in the national economy at a light exertional level. Tr. 36. Also, the ALJ concluded that beginning on May 20, 2014, the plaintiff's sedentary RFC, age of 49 (50 on September 22, 2014), high school education, and level of skilled work experience prevented her from being able to perform her past relevant work. *Id.* At step five, the ALJ relied on the VE's testimony and found that no other work exists in significant numbers in the national economy for an individual with the plaintiff's RFC, age, high school education and skilled work experience. Tr. 28. Accordingly, the ALJ concluded that the plaintiff became "disabled" under the Act on May 20, 2014 but was not "disabled" under the Act from September 15, 2012 through May 19, 2014. Tr. 37. The ALJ also found that the plaintiff qualified for disabled widow's benefits beginning on May 20, 2014. Tr. 38.

II.     **Analysis**

The plaintiff contends the ALJ's conclusion that she was not disabled before May 20, 2014 is not supported by substantial evidence. Dkt. No. 18 at 14. Specifically, Plaintiff argues the ALJ erred in assuming that the plaintiff's onset date was the same day she told her treating physician during an examination that she would *consider* neck surgery, in violation of Social Security Ruling ("SSR") 83-20. Dkt. No. 18 at 14, 17. The Commissioner contends that the ALJ's decision is supported by substantial evidence. Dkt. No. 21 at 5. For the reasons that follow, the Court finds that substantial evidence does not support the Commissioner's conclusion that the plaintiff became disabled on May 20, 2014, and that the plaintiff became disabled on September 15, 2012, her alleged onset date.

I.     **Plaintiff's History of Spinal and Knee Pain Prior to May 20, 2014**

On September 15, 2012, the plaintiff received emergency medical treatment following a car accident where her vehicle was rear-ended by another vehicle. Upon examination, the plaintiff complained of pain in her back, neck, and left knee. Tr. 290-309 (Ex. 2F). X-rays taken of the plaintiff's cervical and lumbar spine, left knee, right tibia and fibula showed no fracture or dislocation, but numerous degenerative changes were observed throughout the spine and in the left knee. *Id.* Mild retrolisthesis was observed at L1-L2 and L2-L3 of the lumbar spine with mild scoliosis convex to the left in the upper lumbar spine and degenerative disc disease changes were observed in the cervical spine at C3-C4 and C6-C7. Tr. 307. Moderate left knee joint effusion was observed with degenerative spurs projecting posteriorly from the patella and more mild spurs projecting laterally and medially. Tr. 306. Plaintiff was treated for a contusion on her right shin and

released with instructions to take Motrin/Tylenol for pain and to visit her primary care physician for follow-up within 3 to 5 days.  Tr. 291, 294.

On September 19, 2012, the plaintiff visited her primary care physician, Masashi Ohira, M.D. ("Dr. Ohira") for post-accident follow-up and for follow-up of chronic low back pain.  Tr. 526.  The plaintiff reported new back pain from the neck to the mid thoracic level and numbness and tingling of her right arm.  Id.  Moderate tenderness over the spine from cervical to mid thoracic region was noted along with numbness from the shoulder to fingers on the right side.  Tr. 527.   A physical therapy evaluation and treatment consult was ordered for her neck and back pain, she was prescribed Flexeril, a muscle relaxant for upper back muscle spasms, and instructed to return in one month for follow-up for her car accident.  Tr. 528. It was noted that the plaintiff's back pain was "likely secondary to muscle spasm," but her x-ray records from the emergency room were necessary for evaluation and possibly also an MRI if her pain did not improve following physical therapy.  Tr. 528.  It was also noted that a future MRI might be necessary to evaluate her numbness and tingling in the right arm.  Tr. 528.

On September 21, 2012, the plaintiff was examined by Chiropractor, John Ward, D.O. ("Dr. Ward").  Tr. 366.  Upon examination, Dr. Ward noted that the plaintiff's movement was very guarded with limited and painful range of motion of her cervical and lumbar spine and severe spasm of paraspinal musculature.  Tr. 366.   Dr. Ward instructed the plaintiff to abstain from work for 30 days, requested her radiology reports from her emergency room examination on September 15, 2012, and prescribed weekly chiropractic treatments (3x).  Tr. 366.   Dr. Ward continued to treat the plaintiff's back and

8

neck pain weekly throughout the relevant time period to July 15, 2013, during which time the plaintiff consistently reported level 7/8/9 (1-10 scale) pain.  Tr. 366-445, 455-492.

On October 6, 2012, Dr. Ward authored a letter to Hartford Insurance describing abnormal results from the baseline physical performance testing that was performed on the plaintiff's flexion, extension, and rotation of her cervical, thoracic, and lumbar spine.  Tr. 692.  Dr. Ward described the plaintiff's treatment plan with a combination of home therapy and weekly chiropractic care that he developed. Tr. 693.

On October 8, 2012, Dr. Ward ordered a MRI of the plaintiff's cervical spine because she continued to report level 8 pain (1-10 scale) despite weekly chiropractic treatments. Tr. 369.

On October 11, 2012, the plaintiff underwent an MRI of her cervical spine that showed a disc bulge at C3-4, C4-5, disc ridging bulging, left paracentral disc herniation at C5-6, ridging bulge with broad-based herniation at C6-7, and a disc bulge at T1-2.  Tr. 362-63.

On October 12, 2012, Dr. Ward referred the plaintiff to an orthopedic specialist to consult for neck and back pain and ordered an EMG to evaluate the plaintiff's complaints of increasing numbing and tingling in her arms.  Tr. 371.

On October 18, 2012, the plaintiff underwent a lumbar spine MRI that showed convex left scoliosis, moderately severe lumbar spondylosis, multi-level disc bulging, generalized posterior facet arthrosis, multilevel retrolisthesis, multilevel

combined central canal and bilateral foraminal stenosis. Tr. 360. The MRI revealed a partially imaged right paracentral disc herniation/protrusion at T11-12 with mild flattening of the right ventral lateral cord; at L1-2, L2-3, retrolisthesis, disc bulging, and mild bilateral foraminal stenosis; and at L2-3, moderately severe combined central canal stenosis, severe right, moderately severe left foraminal stenosis, secondary to retrolisthesis, disc bulging, posterior facet arthrosis, and congenitally small central canal with shortened pedicles. *Id.* The MRI also showed the plaintiff's right foraminal stenosis accentuated by broad-based right foraminal disc herniation/protrusion. Tr. 360-361.

On October 23, 2012, the plaintiff was initially evaluated by William Capicotto, M.D., P.C. ("Dr. Capicotto"), who concluded that she was totally temporarily disabled from injuries "100% causally related to her car accident on September 15, 2012." Tr. 351. Upon examination he performed x-rays of the plaintiff's cervical, thoracic, and lumbar spine, reviewed her cervical and lumbar MRI results from exams performed on October 11, 2012 and October 18, 2012, and diagnosed the plaintiff with cervical, lumbar, and thoracic disc herniations with myelopathy. Tr. 347-351.

On October 24, 2012, the plaintiff was re-evaluated by her primary care physician Dr. Ohira, for a follow-up on her back pain and numbness/tingling of her right arm. Tr. 529. Plaintiff reported 8/10 neck and back pain with little relief despite treatment with the muscle relaxant chiropractic treatment and that she was unable to sleep at night due to her pain. Tr. 530. Dr. Ohira observed normal gait but TTP along the plaintiff's entire spine at spinous processes and paraspinal muscles. Tr. 531. She prescribed

trazodone to help the plaintiff sleep at night and recommended a bone scan to follow up on density observed in the plaintiff's vertebral body on her most recent MRI.  Tr. 531.

On November 2, 2012, the plaintiff had an MRI of her thoracic spine that revealed multilevel intervertebral disc pathology with a mild to moderate central disc herniation at C6-7 encroaching on the anterior/left anterior subarachnoid space, minimal central disc herniations at T1-2 and T6-7, broad based central disc herniation at T3-4 effacing the anterior subarachnoid space, and broad based central disc herniation at T11-12 impinging on the anterior surface of the thecal sac.  Tr. 357-59.

On December 20, 2012, the plaintiff was initially examined by Andrew Matteliano, M.D. ("Dr. Matteliano") for pain treatment and monitoring compliance with pain medication regimen on referral from Dr. Ward. Tr. 317.  Dr. Matteliano noted the plaintiff's cervical tenderness of the upper, mid, and lower cervical paraspinals extending into the thoracic spine with bilateral trapezius trigger points. *Id.* Her cervical turning was limited to forty-five degrees with an extension loss of one-third to one-half.  *Id.*  The plaintiff reported constant neck pain with turning, headaches, and numbness and tingling into both hands. *Id.* She used a traction brace for her cervical spine, relied on a cane to ambulate, a TENS unit, and low back brace.  Tr. 317.  Dr. Matteliano reviewed the plaintiff's MRI results and observed herniations of her cervical and thoracic spine along with multi-level spondylosis and disc bulges of the lumbar spine.  Tr. 318.  Dr. Matteliano noted the plaintiff's antalgic gait along with limitations in bending and extension associated with the lumbar spine although her straight leg and spurlings exams were negative. Tr. 318.  He prescribed Tramadol for the plaintiff to take along with the Flexeril

11

and Naprosyn which she was already taking and recommended that she continue to use her TENS unit, traction brace, back brace, and cane. Tr. 319. Finally, Dr. Matteliano noted that the plaintiff was totally temporarily disabled. Tr. 319.

On January 10, 2013, the plaintiff underwent a bone scan which revealed mild patchy increased uptake in the upper and mid thoracic spine and throughout the lumbar spine consistent with spondylosis and degenerative changes. Tr. 352. Increased uptake in the knees worse on the left consistent with arthritic changes or possible mild bone contusion and minimal scoliosis of the lumbar spine was also noted. Tr. 353.

On February 21, 2013, upon examination of the plaintiff Dr. Matteliano noted her compliance with her Tramadol prescription based on her toxicology screen results. Tr. 315. Dr. Matteliano noted the plaintiff's cervical turning continued at forty-five degrees with extension loss of one third to one half, her EMG and nerve conduction studies showed C6 radiculopathy, and her low back bending was fifty degrees with limited painful extension at ten degrees. Tr. 315. The plaintiff reported ongoing 7-8/10 back and neck pain and reported using a cane to ambulate. *Id.* Dr. Matteliano prescribed Hydrocodone for the plaintiff to try to reduce her pain levels and opined that the plaintiff had total temporary disability from work. Tr. 316.

On March 21, 2013, upon examination Dr. Matteliano discontinued the plaintiff's hydrocodone prescription and returned her to Tramadol because she reported nausea and gastric irritation from the Hydrocodone. Tr. 313.

On May 20, 2013, Dr. Matteliano examined the plaintiff who reported 3-4/10 pain levels and opined that she had total temporary disability due to her back and neck pain

On May 29, 2013, upon examination of the plaintiff, Dr. Capicotto opined that bending, lifting, twisting, and turning, especially extension, flexion, and rotation of the neck would cause Plaintiff increased pain. Tr. 330.

On July 22, 2013, the plaintiff was examined by Dr. Matteliano for continuing back and neck pain with headaches. Tr. 524. She continued to treat with tramadol which reduced her pain to 3-4/10 and regular chiropractic care. *Id.* Dr. Matteliano noted that she had total temporary disability from work where her previous work required lifting. Tr. 525.

On August 28, 2013, the plaintiff reported 9/10 neck pain, 6/10 mid back pain, and 9/10 lower back pain aggravated with prolonged sitting, standing, repetitive twisting, turning, lifting, bending, pushing, and pulling. She also described increasing occipital headaches. Upon examination, Dr. Capicotto found the plaintiff had full strength in her extremities, however, she had limited range of motion of her cervical spine and relied on a cane to ambulate. Dr. Capicotto opined the plaintiff would likely be considered a surgical candidate for her cervical disc herniation with myelopathy, noting the plaintiff's condition had not improved following conservative treatment with a regular chiropractic care and TENS unit. Tr. 497.

On September 17, 2013, the plaintiff was examined by consultative examiner Donna Miller, D.O. ("Dr. Miller") for an internal medicine examination at the request of the Division of Disability Determination to assist in the Agency's initial disability determination. Tr. 447. The plaintiff reported chronic neck and back pain since her car accident in September 2012 that was aggravated by prolonged positions. Tr. 447. Dr. Miller described the plaintiff's treatment as "pain management every two months with Dr. Matteliano" and that she had xrays and MRI's that showed bulging and herniated cervical discs and herniated lumbar discs with stenosis. *Id.* Dr. Miller found the plaintiff appeared to be in no acute distress with normal gait but could squat only 50 percent of normal and although she stated she always used her cane, the doctor opined that she ambulated similarly with and without it. Tr. 448. Dr. Miller found no scoliosis, kyphosis, or abnormality in the plaintiff's thoracic spine. Dr. Miller noted the plaintiff's cervical spine flexion was limited to thirty degrees, extension twenty degrees, twenty degrees rotation bilaterally, and fifteen degrees lateral flexion bilaterally. Tr. 448. The plaintiff's lumbar extension was fifteen degrees, lateral flexion twenty degrees bilaterally, and rotation twenty-five degrees bilaterally. Id. Dr. Miller diagnosed the plaintiff with chronic neck pain/bulging herniated disc; chronic low back pain/herniated disc/lumbar stenosis; hypertension; and hypothyroidism. Tr. 450. Dr. Miller instructed the plaintiff to report to her primary care physician immediately due to her alarming blood pressure levels and issued a medical source statement finding that plaintiff had "mild limitation for heavy lifting, bending, carrying, reaching, pushing, and pulling." *Id.*

On September 23, 2013, the plaintiff was examined by Dr. Matteliano who increased her Tramadol and added Naproxen to reduce inflammation with instructions to continue chiropractic care. Tr. 522-523.

On October 31, 2013, upon examination, the plaintiff's primary care Dr. Oshira noted the plaintiff's general appearance as abnormal, specifically that she was morbidly obese. Tr. 550.

On November 8, 2013, Dr. Matteliano examined the plaintiff who reported increasing numbness and tingling due to her cervical and thoracic pain which she described at a 7-8/10. Tr. 520. Dr. Matteliano prescribed a Butrans patch in addition to Tramadol and discussed trying Lyrica therapy in the future. Tr. 521. Dr. Matteliano noted that the plaintiff was totally temporarily disabled from work. *Id.*

On November 12, 2013, the plaintiff was examined by Dr. Matteliano who noted posterior cervical tenderness over C3 causing pain into the occiput region in addition to limited cervical rotation and extension. Tr. 518. The plaintiff reported that chiropractic treatments were not improving her cervical spine and Dr. Mattelliano advised her to seek massage therapy treatments and started her on a trial of Lyrica. Tr. 519.

On December 20, 2013, upon examination following her hospitalization for pneumonia the plaintiff's primary care, Dr. Oshira noted the plaintiff's abnormal gait with her cane from her previous car accident. Tr. 557.

On February 5, 2014, the plaintiff was examined by Dr. Matteliano who observed cervical and lumbar tenderness with seventy-five percent range of motion in the cervical spine, thirty degrees flexion in the lumbar region and zero extension. Tr. 516. Dr. Matteliano noted that the plaintiff's function declined after she suffered from pneumonia and was unable to afford Lyrica because insurance would not cover it. Tr. 516-17. He increased her Butrans patch and instructed her to continue with exercises, again opining that she had total and temporary disability from work. Tr. 517.

On March 11, 2014, the plaintiff was examined by Dr. Matteliano who found continued cervical tenderness with cervical turning just past sixty degrees, mid-thoracic pain, lumbar pain with flexion forty degrees and low back tenderness. Tr. 514. Dr. Matteliano continued the Butrans patch prescription and opined that she had total temporary disability from work. Tr. 514-15.

On April 14, 2014, the plaintiff was examined by Dr. Matteliano and reported 4/10 pain in the midthoracic, cervical, and lumbar spine. Dr. Matteliano noted that she could bend forty degrees and turn approximately sixty degrees. Tr. 512. Dr. Matteliano continued the Butrans patch and opined that she had total temporary disability from work. Tr. 513.

On May 13, 2014, the plaintiff was examined by Dr. Mattelliano who noted the plaintiff's continued tenderness in the low back and cervical spine (3-4/10 pain) with the capability to turn sixty degrees and bend forty degrees. Tr. 510. Dr. Matteliano

continued the plaintiff's Butrans patch prescription and opined that she was totally temporarily disabled.  Tr. 510-11.

On May 20, 2014, Dr. Capicotto performed x-rays of Plaintiff's cervical spine and observed fairly normal alignment but a loss of lordosis; osteophyte formation; disc narrowing; but no significant instability with flexion or extension.  Tr. 506.  He discussed cervical fusion surgery with the Plaintiff at length given that it had been over a year since her accident and she had not noted any more improvement of her condition. The plaintiff agreed to consider surgery for her neck.  *Id.*

On September 12, 2014, Dr. Capicotto performed a cervical fusion of Plaintiff's C5-6 and C6-7 cervical discs. Tr. 679.

## II.    The ALJ's Finding that Disability Began on May 20, 2014 is Not Supported by Substantial Evidence

The plaintiff contends the ALJ's determination that she was not disabled prior to May 20, 2014 is unsupported by substantial evidence because the ALJ should have found her alleged onset date as the "traumatic origin" of her injuries in accordance with SSR 83-20, 1983 WL 31249 (Jan. 1, 1983). Dkt. No 18 at 16.   For the reasons set forth below, the Court agrees.

SSR 83-20 governs the SSA's determination of disability onset dates and is binding on the Commissioner.    SSR 83-20, 1983 WL 31249 (Jan. 1, 1983); see *Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984) (noting that, although Social Security Rulings

do not have the force of law, they are binding on "all components of the SSA"); *Martinez v. Barnhart*, 262 F. Supp. 2d 40,45 (W.D.N.Y. 2003) (SSR 83-20 is binding on the Commissioner). SSR- 83-20 distinguishes between disabilities of traumatic origin and those of non-traumatic origin.  For disabilities of traumatic origin, the Ruling states that "onset is the day of the injury if the individual is thereafter expected to die as a result or is expected to be unable to engage in substantial gainful activity … for a continuous period of at least 12 months."  SSR 83-20, at *2.  Determination of an onset date for disabilities of non-traumatic origin is more complicated.  For disabilities of non-traumatic origin, SSR 83-20 requires that the ALJ consider three elements: the individual's allegation, work history, if any, and medical or other evidence concerning impairment severity.  SSR 83-20, 19at *1.

"Where the ALJ determines that the date of onset is other than what the claimant alleges, [she] has an affirmative obligation to adduce substantial allegations, work history, if any, and the medical and other evidence concerning impairment severity [,] … medical evidence serves as the primary element in the onset determination."  SSR 83-20, 1983 WL 31249, at *2.  The Ruling goes on to state that "the date alleged by the individual should be used if it is consistent with all the evidence available …. However, the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record."  *Id.* at *3.  The "starting point" is the claimant's allegation as to when his or her disability began.  *Id.* at *2.  That date "should be used if it is consistent with all the evidence available."  *Id.* at *3.  Moreover, "[t]he day the impairment caused the individual to stop work is frequently of great significance in selecting the proper onset date."  *Id.* at *2.  Medical evidence, however, is the "primary

element" in determining a claimant's onset date. *Id.*; *see Credle v. Apfel*, 4 F. App'x 20, 25 (2d Cir. 2001) (summary order).

In *Credle*, the Second Circuit Court of Appeals found that the claimant's alleged onset date was not a traumatic origin of his disability where although he suffered a traumatic beating at the hands of his co-workers, he was medically cleared to return to work by several of his doctors as soon as four months after the incident. *Id.* at 24. The *Credle court* found the claimant had *elected* to avoid gainful employment where his medical records reflected that he was medically cleared to return to work with no limitations. *Id.* Unlike the claimant in *Credle*, the plaintiff's treating physicians continuously opined that she was totally temporarily disabled beginning in September 2012 through May 20, 2014. Plaintiff's chiropractor, Dr. Ward found the plaintiff was totally temporarily disabled beginning in September 2012, throughout the relevant time period. Tr. 366-445, 455-492. Plaintiff's orthopedic specialist, Dr. Capicotto, treated her from October 2012 throughout the relevant time period and consistently opined that she was totally temporarily disabled. Tr. 328-51, 493-507, 635-690. Pain management specialist Dr. Matteliano treated the plaintiff from December 2012 throughout the relevant time period and likewise consistently opined that she was totally temporarily disabled. Tr. 313-319, 510-523. At no point was the plaintiff medically cleared to return to work by her treating physicians following her car accident on September 15, 2012.

However, the ALJ determined that the plaintiff retained the RFC to perform light work from September 15, 2012 until May 20, 2014. Tr. 27. An RFC assessment must first identify the individual's functional limitations or restrictions and assess his or

her work-related abilities on a function-by-function basis.  SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  "In particular, the ALJ must make a function by function assessment of the claimant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch, based on medical reports from acceptable medical sources that include the sources' opinions as to the claimant's ability to perform each activity." *Wojciechowski v. Colvin*, 967 F.Supp.2d 602, 609 (N.D.N.Y. 2013) (internal citations omitted).  In determining the plaintiff's abilities, the ALJ accorded "substantial weight" to the opinion of consultative examiner Dr. Miller that the plaintiff "had mild limitation for heavy lifting, bending, carrying, reaching, pushing, and pulling" where she reasoned it was "based on an in-person examination, was the only opinion that addressed function-by-function limitations, and was generally consistent with the plaintiff's activities of daily living."  Tr. 32.  Unlike a treating source, "a 'non-treating source' is defined as a 'physician, psychologist, or other acceptable medical source who has examined [the plaintiff] but does not have, an ongoing treatment relationship with [the plaintiff].'" *Calixte v. Colvin*, 2016 WL 1306533, at *24 (E.D.N.Y. Mar. 31, 2016) (quoting 20 C.F.R. § 416.902).  A consultative examiner, such as Dr. Miller, is considered a non-treating source.  *See Dannettel v. Comm'r of Soc. Sec.*, 2014 WL 4854980, at *7 n.4 (N.D.N.Y. Sept. 30, 2014).  When weighing the opinion of a non-treating source, the ALJ must consider how closely the opinion aligns with objective medical record evidence, which is similar to its evaluation of a treating source.  *See Zongos v. Colvin*, 2014 WL 788791, at *7 (N.D.N.Y Feb. 25, 2014).

Here, the ALJ omitted any consideration of how Dr. Miller's opinion aligned with the multitude of objective medical test results including MRI, EMG, and x-rays that

the plaintiff underwent prior to her consultative examination with Dr. Miller on September 17, 2013. Further, Dr. Miller's opinion did not consider all of the plaintiff's impairments and did not account for all of the plaintiff's limitations. Most notably, Dr. Miller did not consider the plaintiff's osteoarthritis of her left knee, which the ALJ found to be a severe impairment and which was documented first by x-ray performed on September 15, 2012 in the emergency room. According to the ER Report, degenerative spurs were observed projecting posteriorly from the left knee patella, with more mild spurs projecting laterally and medially. Tr. 295. The plaintiff's testimony and medical examination notes reflect that she has relied on a cane for walking and weightbearing since September 2012, because of her impairments. On her application for benefits, she stated that she could only stand for 10 to 15 minutes at a time, walk only short distances before needing to sit down, and sit only for a little while before she started to ache. Tr. 229-230. Dr. Miller discredited the plaintiff's cane use noting that although she had a cane, she did not reach for it. The ALJ did not incorporate the plaintiff's cane use in her RFC prior to May 20, 2014, and did not consider her cane use until that date.

Medical source opinions that are "conclusory, stale, and based on an incomplete medical record" may not be substantial evidence to support an ALJ finding. *Griffith v. Astrue*, No. 08-CV-6004, 2009 WL 909630, at *9 n. 9 (W.D.N.Y. July 27, 2009). This Court is unable to discern how the ALJ, who is not a medical professional, determined that the plaintiff was capable of: sitting, standing, and walking for six hours out of an eight-hour workday; occasional balancing, stooping, kneeling, crouching, crawling or climbing ramps or stairs, but never ladders, ropes or scaffolds; and performing work that did not involve operating a motor vehicle; based on Dr. Miller's

opinion from 2013 that did not address those functions. *See Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) ("[J]udges, including administrative law judges of the [SSA], must be careful not to succumb to the temptation to play doctor."). This error is significant where the ALJ found that Plaintiff suffered from the following severe impairments: disc herniations in the cervical, thoracic, and lumbar spine with myelopathy; osteoarthritis of the left knee; and obesity. Tr. 26. Especially where the plaintiff's medical evidence prior to May 20, 2014, reflects substantially the same injuries and symptoms as reflected by the medical evidence subsequent to May 20, 2014, which the ALJ relied on to find the plaintiff disabled.

Ultimately, the ALJ determined that the plaintiff's disability began on May 20, 2014, when she told Dr. Capicotto that she would discuss the possibility of cervical fusion surgery with her family. Tr. 33. The plaintiff's neck injury and resulting pain are documented consistently throughout the medical record, beginning on September 15, 2012 when she complained of neck pain in the emergency room following her accident. On August 28, 2013, (before the plaintiff was examined by Dr. Miller) Dr. Capicotto opined the plaintiff "would likely be considered a surgical candidate for her cervical disc herniation with myelopathy," noting the plaintiff's condition had not improved following conservative treatment with a regular chiropractic care and TENS unit. Tr. 497. On October 11, 2012, the plaintiff underwent a cervical spine MRI that showed a disc bulge at C3-4, C4-5, disc ridging bulging, left paracentral disc herniation at C5-6, ridging bulge with broad-based herniation at C6-7, and a disc bulge at T1-2. Tr. 362-63. The same left paracentral disc herniation was observed again on an MRI performed on the plaintiff on September 3, 2014, just prior to undergoing neck surgery. Aside from the treatment

22

option of neck surgery, the medical evidence from before and after May 20, 2014,

documented significantly similar injuries, symptoms, and treatment methods.  Therefore,

the ALJ's determination that the plaintiff became disabled on May 20, 2014, simply

because she was willing to discuss surgery is unsupported by substantial evidence and

completely arbitrary.

In her decision, the ALJ also found the plaintiff's statements concerning the

intensity, persistence, and limiting effects of her symptoms "not entirely credible" prior to

May 20, 2014.  Tr. 27-33.  Where supported by objective medical evidence, a claimant's

subjective evidence of pain is entitled to great weight.  *Simmons v. U.S.R.R. Ret. Bd.*,

982 F.2d 49, 56 (2d Cir. 1992).  If a claimant's subjective evidence of pain suggests a

greater severity of impairment than can be demonstrated by objective evidence alone,

the ALJ must consider other evidence, such as the claimant's daily activities, duration

and frequency of pain, medication, and treatment.  *See* 20 C.F.R. § 404.1529(c)(3).

Where supported by specific reasons, "an ALJ's credibility determination is generally

entitled to deference on appeal.*"  Selian v. Astrue*, 708 F.3d 409, 420 (2d Cir.2013).  The

ALJ reasoned that the plaintiff's reported activities of daily living were not consistent with

the allegation of disability as of the alleged onset date.  On her initial daily activities report

filed on July 19, 2013, the plaintiff stated that she could stand no longer than ten minutes

at a time, relied on her husband for help at home, could not clean her house, wash

clothes, iron, work in her garden, cut her grass, mop and wax floors, walk in the park or

get a good night's sleep.  Tr. 225-30.   The ALJ did not specify which of the Plaintiff's

reported activities of daily living conflicted with her statements concerning the intensity,

persistence, and limiting effects of her symptoms.

23

In addition to crediting Dr. Miller's opinion in support of finding the plaintiff retained the RFC to perform light work prior to May 20, 2014, the ALJ also found that the plaintiff's attempts to apply for food service jobs in early 2014 indicated that she was capable of her previous work. Tr. 35. The mere fact that a claimant applied for jobs does not mean that she was not disabled. The plaintiff testified that she worked up until the day she was involved in a car accident on September 15, 2012. Tr. 67. Although the plaintiff also testified that she applied for jobs in food service in early 2014, her earning records indicated no earnings since 2012. Tr. 52-53, 200. In fact, the ALJ highlighted the plaintiff's "excellent work history" in her decision, including work at well above the substantial gainful activity level during each of the ten years immediately preceding the alleged onset date and that it provided support for her allegations of disability and inability to work. Tr. 36.

Beginning on May 20, 2014, the ALJ determined that the plaintiff's statements were "generally credible" and factored the plaintiff's cane use into the RFC finding that Plaintiff retained the ability to perform sedentary work with numerous additional limitations, a notably more restrictive RFC, which the ALJ found rendered the plaintiff disabled. Tr. 33, 37. "As a general rule, a claimant's allegation regarding the date of onset must be accepted provided it is consistent with medical evidence in the record." *Nix v. Colvin*, No. 15-CV-0328- FPG 2016 WL 3681463, at *5 (W.D.N.Y. July 5, 2016); see also *Credle*, 4 Fed. Appx. 20, 23 (2d. Cir. 2001). After thoroughly reviewing the administrative record, this Court finds that the ALJ erred in determining that plaintiff retained the RFC to perform light work up until May 20, 2014, by: relying on Dr. Miller's incomplete, stale opinion; improperly discrediting the plaintiff's testimony; and failing to

rectify the inconsistencies between Dr. Miller's opinion on the one hand and the plaintiff's testimony and medical record on the other. The established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record. SSR 83-20 at *3. Based on the foregoing, this Court finds that the plaintiff has been disabled since September 15, 2012, the date of the car accident which was the traumatic origin of her injuries.

### III.   Remedy

Under 42 U.S.C. § 405 (g), the district court has the power to affirm, modify, or reverse the ALJ's decision with or without remanding for a rehearing. *Bell v. Secretary of Dept. of Health and Human Services of U.S.*, 732 F.2d 308, 312 (2d Cir. 1984). Where the existing record contains persuasive proof of disability and a remand for further evidentiary proceedings would serve no further purpose, a remand for calculation of benefits is appropriate. *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980).

This Court finds that the ALJ failed to follow the procedures set forth in SSR 83-20 and further failed to support her onset date determination with substantial evidence. Furthermore, the ALJ already found the plaintiff was disabled as of May 20, 2014. The record in this case is complete, and further development cannot be reasonably expected to support a finding that the plaintiff is not disabled. See *Martinez*, 262 F.Supp.2d at 49 (remanding for calculation and payment of benefits where the record demonstrated disability, there were no other medical records available, and further administrative proceedings would serve no purpose). Reversal for calculation of benefits is particularly appropriate in this case because the plaintiff's claim for benefits has been

pending for over six years, the Commissioner already found her disabled, and additional administrative proceedings are unnecessary and would only lead to further delay. See *Diaz ex rel. E.G. v. Comm'r of Soc. Sec.*, No. 06-CV-530-JTC, 2008 WL 821978, at *8 (W.D.N.Y. Mar. 26, 2008) ("[W]here the record contains persuasive proof of disability and application has been pending for over six years, the court is reluctant to contribute to any further delay by remanding for further proceedings.") For the reasons set forth herein, this Court finds that the only reasonable conclusion to be drawn from the administrative record, reviewed under proper legal standards, is that plaintiff was disabled as of September 15, 2012. Accordingly, the Court finds that remand solely for the calculation and payment of benefits from the plaintiff's alleged onset date of September 15, 2012 is warranted.

## CONCLUSION

For the reasons stated above, Defendant's motion for judgment on the pleadings (Dkt. No. 21) is DENIED, and Plaintiff's motion for judgment on the pleadings (Dkt. No. 18) is GRANTED to the extent that the Commissioner's decision is reversed, and the matter is remanded solely for the calculation of benefits.


DATED:     Buffalo, New York
           February 28, 2019


                              *s/ H. Kenneth Schroeder, Jr.*
                              **H. KENNETH SCHROEDER, JR.**
                              **United States Magistrate Judge**